Filed 7/27/15  P. v. Belcher CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067428 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1202533) |
| CORY HEATH BELCHER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Belcher guilty of five offenses (counts 1, 3, 4, 5 & 6), as follows:  (1) active participation in a criminal street gang (count 1:[1] Pen. Code,[2] § 186.22, subd. (a), hereafter section 186.22(a)); (2) attempting to prevent or dissuade a victim, Yvonne Velarde, from reporting the kidnappings charged in this case (count 3:  § 136.1, subd. (b)(1)); (3) kidnapping Luis Rodriguez during the commission of a carjacking and in order to facilitate the carjacking (count 4:  § 209.5); (4) carrying a concealed weapon in a motor vehicle (count 5:  § 25400, subd. (c)(3)); and (5) vehicle theft (count 6:  Veh. Code, § 10851, subd. (a)).

The jury found to be true gang enhancement allegations that Belcher committed counts 3, 4, and 6 for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b), hereafter section 186.22(b)).

The jury found Belcher not guilty of the simple kidnapping of Velarde and Rodriguez (counts 2 & 7, respectively:  § 207, subd. (a)).

On January 25, 2013, the court sentenced Belcher to a total prison term of 15 years to life.  The sentence consisted of an indeterminate term of 15 years to life for the kidnapping of Rodriguez during the commission of a carjacking and in order to facilitate

---

[1]    Although this charged offense was listed as count 7 in the second amended complaint, it was referred to as count 1 in both the jury instructions and the jury verdict forms.  In his appellant's opening brief, Belcher asserts that "[t]his was apparently done to prevent the jury from learning the prosecution had dismissed [another charged offense listed as] count 1 as filed."   We shall refer to the substantive gang charge as count 1, not count 7.

[2]    All undesignated statutory references are to the Penal Code unless otherwise specified.

2

the carjacking (count 4), plus a concurrent term of seven years to life for the attempt to dissuade Velarde from reporting a crime (count 3); plus a concurrent determinate term of five years eight months for the remaining convictions and enhancements.

Belcher appeals, raising the following 12 contentions: (1) his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the testimony of Rodriguez, the alleged count 4 victim and a witness for the prosecution, established Belcher's claim-of-right defense as a matter of law; (2) his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the evidence is insufficient to establish that he moved Rodriguez "a substantial distance 'from the vicinity' of the carjacking" as required by section 209.5, subdivision (b) (hereafter section 209.5(b)); (3) his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the evidence is insufficient to establish that he moved Rodriguez by force or fear; (4) his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the court erroneously failed to instruct the jury on the defense of actual consent; (5) if this court agrees there is insufficient evidence to support his count 4 conviction, his count 3 conviction of attempting to dissuade witness Velarde also must be reversed on the ground Velarde was not a witness to a crime; (6) his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the court erroneously failed to give the jury a unanimity instruction as to which movements constituted the kidnapping of Rodriguez; (7) his count 5 felony conviction of carrying a concealed weapon in a motor vehicle must be reversed because it was "improperly elevated to a felony"; (8) his conviction of active participation in a criminal street gang must be reversed because the

3

evidence is insufficient to establish he engaged in any felonious criminal conduct; (9) the court erred in sentencing him to an indeterminate term of seven years to life for his count 3 conviction of attempting to dissuade witness Velarde; (10) his count 1 conviction of active participation in a criminal street gang and the gang enhancements imposed as to counts 3, 4, and 6 must be reversed because the evidence is insufficient to prove the primary activities and pattern of criminal activity elements of the gang charges. (11) in the alternative, his count 1 conviction of active participation in a criminal street gang and the gang enhancements imposed as to counts 3, 4, and 6 must be reversed because the court failed to sua sponte instruct the jury as to the specific enumerated offenses the prosecution was relying upon to prove the requisite primary activities and pattern of criminal activity elements; and (12) if this court determines that none of the foregoing claimed errors "individually warrant[s] reversal," reversal is required because "the cumulative effect of all these errors demonstrates that a miscarriage of justice occurred."

For reasons we shall explain, we conclude Belcher's conviction of count 1 and the seven-year-to life sentence imposed for his conviction of count 3 must be reversed, and his felony conviction of count 5 must be reversed and reduced to a misdemeanor. We remand this case to the trial court with directions.

FACTUAL BACKGROUND

Rodriguez testified that prior to May 15, 2012[3]—the date of the events from which this case arose—his wife, Velarde, bought a Pontiac automobile (hereafter the car or

---

3    All further dates are to calendar year 2012 unless otherwise specified.

Velarde's car) that needed repairs. Rodriguez took the car to Belcher, whom he had met through Joey Campana, an acquaintance with whom Rodriguez had worked. Belcher fixed the car. In lieu of paying Belcher for the repair work, Rodriguez agreed to let him borrow the car for a few days. Belcher used the car for about a week.

Rodriguez testified that when he asked Belcher to return the car, Belcher made excuses and it became apparent to Rodriguez that Belcher did not want to return the car. Rodriguez eventually convinced Belcher to return the car in exchange for Rodriguez's promise that Belcher could use Rodriguez's Jeep Cherokee (the jeep) instead. Belcher returned the car keys to Rodriguez, who took possession of the car one or two days before Mother's Day (May 13). However, when Rodriguez failed to take the jeep to Belcher, Belcher began calling Rodriguez to ask for the jeep. Rodriguez ignored his calls.

On May 15 Belcher, who was a leader and active participant in the La Sierra Brown Knights clique of the La Sierra Riva gang (hereafter the La Sierra Brown Knights or the La Sierra gang), Rodriguez was at work. Belcher was accompanied by a group of men, one of whom was armed with a gun. Velarde testified that Belcher told her Rodriguez had sold him the car and that he was there to get it. Surprised by Belcher's statement that Rodriguez had sold him her car, Velarde angrily called Rodriguez to find out what was going on and told him Belcher was there with a bunch of people, one of whom had a gun. Velarde told Rodriguez that if he did not bring the car, they were going to take the jeep. Rodriguez testified he told Velarde he had not sold the car to Belcher and he would come home to meet with Belcher.

5

Knowing that at least one of Belcher's associates had a gun, Rodriguez armed himself with a BB gun that did not function and asked his friend Raquel Valdez to pick up the car from his work and take it to her house. Rodriguez asked Belcher to meet him at a Taco Bell near Rodriguez's house, but Belcher refused. Rodriguez then agreed to meet with Belcher at Rodriguez and Velarde's house.

When Rodriguez arrived at his house, Belcher was waiting with about 10 other people. Campana was there, too. Rodriguez directed Velarde to watch from a distance so that she could call the police if Belcher did anything to him. During Rodriguez's interaction with Belcher, one of Belcher's associates lifted his jacket and showed Rodriguez he was carrying a firearm.

Rodriguez testified that Belcher told him he (Rodriguez) had given his word that he was going to lend him the car. Rodriguez then testified that "[Belcher] kind of had me there. Because, yes, I did tell him that . . . I was going to let him use it." Belcher told Rodriguez that he needed the car for two or three more days. To avoid having any problems with Belcher, Rodriguez agreed to let him use the car. Rodriguez testified he "[didn't] believe [he] had another option" and had to let Belcher take the car. When the prosecutor asked why he felt he had no other option, Rodriguez replied, "[T]hese people were coming to take the car. They were going to leave with the car one way or another." The prosecutor then asked whether Rodriguez had any fear. Rodriguez testified that "[a]t that point" he had "a little bit [of fear]."

Rodriguez asked Belcher to tell Velarde that he had told Belcher he could borrow the car for a few days. Belcher refused to do so and told Rodriguez, "Tell her the truth,

6

that you're selling [it] to me." Rodriguez reacted by saying, "What?" He then told Belcher he could not take the car.

Just then, a helicopter appeared overhead. Rodriguez thought someone had called the police. Belcher told Velarde they should go inside the house so they would not be outside. Although Rodriguez did not want to go inside the house, he, Belcher, and Velarde, and Belcher's armed associate went inside.

Rodriguez testified that Belcher continued to lie by telling Velarde that Rodriguez had sold him the car in exchange for fixing it. Belcher asked for the pink slip for the car. It was apparent to Rodriguez that Belcher wanted the car. Velarde testified she was afraid and told Rodriguez she did not want "problems." She told Rodriguez to give Belcher the car and to take it as a lesson learned in dealing with "certain people."

Belcher, Rodriguez, and Campana left Rodriguez's house in the jeep to get the car, which Rodriguez said was at his work. Before they left, Belcher told Velarde that he ruled the streets and that she better not do anything stupid, such as call the police, because he knew where she lived and that she had kids. Rodriguez sat in the back seat. Campana tried to sit in the front seat, but Belcher told him to sit next to Rodriguez. Belcher drove the jeep. Rodriguez testified that, at this point, he could not believe what was happening; that is, that "[s]omeone just for no reason is just going to come and take your things."

Instead of going directly to get the car, Belcher drove them to his house. Rodriguez became more afraid when they arrived at Belcher's house. Practically all of the men who had been at Rodriguez's house were now at Belcher's house. Belcher went

7

inside his house. Rodriguez remained in the jeep behind the driver's seat. Belcher's armed associate stood outside the jeep and stared at Rodriguez in an intimidating way. Campana got into the back seat next to Rodriguez, and Belcher's armed associate got in next to Campana.

Belcher returned to the jeep with his girlfriend. Belcher again drove, and his girlfriend sat in the front seat next to him. They drove off to pick up the car. During the drive, Belcher's armed associate continued to stare menacingly at Rodriguez. When Rodriguez, who was afraid, asked why he was staring at him, the armed man responded, "Shut the fuck up, motherfucker. You think I can't kill you[?]" During the drive, Rodriguez revealed that the car was not at his office, but at Valdez's house, and he showed Belcher how to get there. Belcher accused Rodriguez of lying and trying to take him to the police station.

When the group arrived at Valdez's house, Belcher and his girlfriend remained in the jeep while Rodriguez, Campana, and Belcher's armed associate went to the house to get the car keys from Valdez. Valdez later told the police that the men appeared to be controlling Rodriguez, who looked very nervous. Valdez gave the keys to Rodriguez, who gave them to Campana and the associate, and they in turn handed them over to Belcher. Belcher and his girlfriend got into the car, and Campana and the armed associate got into the jeep. It seemed to Rodriguez that they were going to leave him behind, so he asked Belcher what was going on. Belcher directed Rodriguez to get in the jeep, and Rodriguez complied.

8

Belcher drove the car to a gas station, and the jeep followed. At the gas station, Belcher noticed that the driver of a Lexus who was paying for gas had left the keys inside the Lexus. Belcher told Campana to take the Lexus. Campana got into the Lexus and drove it away. With Rodriguez still inside the jeep, Belcher's armed associate drove away in the jeep and returned to Valdez's house. After they had stayed there about an hour and a half, Valdez wanted them to leave, so she convinced them to go with her to a gas station to buy cigarettes. After they bought gas and cigarettes, Belcher's armed associate dropped Valdez off at her home and took Rodriguez back to Belcher's house. When they arrived at Belcher's house, Rodriguez asked the armed associate for the keys to the jeep. The man said he had to ask Belcher first. Rodriguez waited outside for him to do so. Campana came outside and handed Rodriguez the keys.

Velarde and Rodriguez, who were initially too afraid to call the police and did not want any problems, decided to call and report the events that had happened a few days earlier.

Several days later, a police officer pulled Belcher over while he was driving the car with four passengers, including Campana. The car was still registered to the original owner, Elmer Frazier. The officer asked Belcher how he got the car, and Belcher said his uncle had bought it. Belcher gave the police permission to search the car. The police found a .38-caliber revolver underneath the steering column. The car was impounded, and Belcher called Rodriguez and asked him to retrieve the car from impound to give it back to him.

Belcher was arrested and, while in custody, he made phone calls to his girlfriend. During one of them, he told her to testify at the preliminary hearing and to say that she was in the car, but "nothing else."  He also told her to say that only he, she, Campana, and Rodriguez were in the car.  In another call, Belcher told his girlfriend to get someone to find Rodriguez and "get that motherfucker and take him to fucking go see [Belcher's] lawyer" and to "tell [him] he fucking lied about me fucking carjacking his ass."

DISCUSSION

I.  *SUFFICIENCY OF THE EVIDENCE* (*COUNT 4*:  *CLAIM-OF-RIGHT DEFENSE*)

Belcher first contends his count 4 conviction of kidnapping Rodriguez to facilitate a carjacking must be reversed because the testimony of Rodriguez—the alleged count 4 victim who testified for the prosecution—established Belcher's claim-of-right defense as a matter of law.  We reject this contention.

A.  *Applicable Legal Principles*

1.  *Kidnapping to facilitate a carjacking*

Section 209.5, subdivision (a) (hereafter section 209.5(a)) defines the offense of kidnapping to facilitate a carjacking:

> "Any person, who, during the commission of a carjacking and in
> order to facilitate the commission of the carjacking, kidnaps another
> person who is not a principal in the commission of the carjacking
> shall be punished by imprisonment in the state prison for life with
> the possibility of parole."

Carjacking, in turn, is defined as "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and

10

with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).)

Thus, a defendant commits a kidnapping to facilitate a carjacking in violation of section 209.5(a) when (1) the defendant commits a carjacking (i.e., uses force or fear to take a vehicle from the victim); (2) the defendant commits a kidnapping to facilitate the carjacking; (3) the kidnapping involves movement of the victim beyond what is merely incidental to the carjacking (i.e., the victim is moved a substantial distance from the vicinity of the carjacking); and (4) such movement of the victim increases the risk of harm to the victim over and above the risk present in the crime of carjacking. (§§ 209.5, 215; *People v. Medina* (1999) 41 Cal.4th 685, 693.)

2. *Claim-of-right defense*

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 (*Tufunga*).)

However, in California limitations have been imposed on the availability of the claim-of-right defense. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1144.) "For example, the defense is not permitted where the claimed right to the property is rooted in a 'notoriously illegal' transaction." (*Ibid*.; see CALCRIM No. 1863 ["The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal."].)

11

The claim-of-right defense also does not apply "'if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.'" (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 643 (*Fenderson*), quoting CALCRIM No. 1863, italics omitted; see also § 511 [requiring the "open[] and avowed[]" taking of property in order to establish a claim-of-right defense].)

The claim-of-right defense also does not apply if the claim arose from the taking of property "to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated." (*Tufunga*, *supra*, 21 Cal.4th at p. 956; see CALCRIM No. 1863 ["The claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount."]; see also 2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 38, p. 62 ["[T]he unlawful retention of the property of another to offset or pay demands held against that person is not excused."].)

In addition, a jury may conclude that a defendant's subjective belief he or she had a right to the property was "not held in good faith" if the defendant "was aware of facts that made that belief completely unreasonable." (CALCRIM No. 1863, quoted in *Fenderson*, *supra*, 188 Cal.App.4th at p. 643; see *People v. Stewart* (1976) 16 Cal.3d 133, 140 ["[T]he circumstances in a particular case might indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith."].)

3. *Standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view

12

the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

"If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [trier of fact's] verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

B. *Analysis*

Belcher contends his claim-of-right defense to the crime of kidnapping Rodriguez to facilitate a carjacking charged in count 4 was established as a matter of law. The

Attorney General, however, argues that Belcher "is essentially challenging the jury's implicit finding that there was insufficient evidence to support his claim-of-right-defense." We agree.

Belcher asserts that "[t]he undisputed evidence showed [he] had a good faith belief in a claim-of-right to possession of the [car]." He also asserts that "[t]he evidence was not merely undisputed -- it was presented through the testimony of the prosecution's own complaining witness, Rodriguez," who "unequivocally affirmed" that he had "promised to loan the [car] to [Belcher]." Belcher principally relies on Rodriguez's testimony that, when he met with Belcher on May 15 (the date of the charged kidnapping to facilitate a carjacking) at Rodriguez and Velarde's home, Belcher told him he (Rodriguez) had given his word that he was going to lend him the car. As Belcher points out, Rodriguez then testified that "[Belcher] kind of had me there. Because, yes, I did tell him that . . . I was going to let him use it."

From this testimony by Rodriguez, the jury could have drawn an inference that Belcher believed he had a right to continue using Velarde's car after he had used it for about a week and had returned it after Rodriguez said he could use Rodriguez's jeep.

However, the jury, which had been instructed on the claim-of-right defense, was free to reject that inference in light of other substantial and conflicting evidence—including testimony by Rodriguez—from which the jury could (and did) reasonably draw the contrary inference that Belcher knew he did not have the right to take and continue using Velarde's car after he returned it. For example, Rodriguez testified that Belcher had repaired the car and, in lieu of paying Belcher for the repair

14

work, he had agreed to let Belcher "borrow" the car and "use it for a *few days*." (Italics added.) Rodriguez also testified that Belcher used the car for about "[s]even, eight days," but when he asked Belcher to return it, it became apparent to Rodriguez that Belcher did not want to return the car. Rodriguez indicated at trial that he eventually convinced Belcher to return the car in exchange for Rodriguez's promise that Belcher could use Rodriguez's jeep instead, and Belcher returned the car one or two days before Mother's Day (May 13). Rodriguez also testified, however, that when Belcher began calling Rodriguez repeatedly to ask for the jeep, Rodriguez would not answer his calls. Rodriguez's foregoing testimony supports a reasonable inference that Belcher was aware—after he had used the car for about a week, and after he had returned the car at Rodriguez's request and Rodriguez was refusing to let him use the jeep—that he no longer had the right to use the car.

Additional substantial evidence supports such an inference. Velarde testified that Belcher came to Rodriguez's and her house on May 15 with a group of people—one of whom was armed with a gun—and told her he was there to get the car. Rodriguez testified that he asked Belcher to tell Velarde that he (Rodriguez) had told Belcher he could borrow the car for a few days and, when Belcher "changed the whole story" and told Velarde that Rodriguez had sold him the car, Rodriguez reacted by saying "What?" and told Belcher he could not take the car. Rodriguez also testified that Belcher lied when he told Velarde that Rodriguez had sold him the car in exchange for fixing it.

By selectively relying on portions of Rodriguez's testimony that are favorable to himself, Belcher contravenes a fundamental principle governing the application of the

15

substantial evidence standard of review:  A reviewing court must view the evidence *in the light most favorable to the judgment* to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578; see *Jackson v. Virginia*, *supra*, 443 U.S. at p. 319.)  By failing to present the evidence in the light most favorable to the People, Belcher has failed to meet his burden of showing the evidence was insufficient.  (*People v. Sanghera*, *supra*, 139 Cal.App.4th at p. 1574 ["[i]f the defendant . . . fails to present [the relevant] evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient"].)

The jury's rejection of Belcher's claim-of-right defense is also supported by substantial evidence showing that he repeatedly attempted to conceal his taking of Velarde's car and acted in a manner demonstrating consciousness of guilt.  The claim-of-right defense does not apply "'if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.'"  (*Fenderson*, *supra*, 188 Cal.App.4th at p. 643, quoting CALCRIM No. 1863, italics deleted; see also § 511 [requiring the "open[] and avowed[]" taking of property in order to establish a claim-of-right defense].)

Here, Rodriguez's testimony shows that he agreed to *lend* the car to Belcher for a few days in lieu of paying Belcher for the work he performed in repairing the car, and that Belcher used the car for about a week.  Joshua Ontko, a Riverside police officer, testified that when he stopped Belcher on May 19 while Belcher was driving the car, Belcher told him his uncle had bought the car.  A recording of Officer Ontko's interview of Belcher, which was admitted in evidence, shows that when Officer Ontko asked about

16

how Belcher got the car, Belcher replied, "My uncle bought it" and "What's up man?" The foregoing evidence supports a reasonable inference that Belcher was attempting to conceal the fact that he had taken the car from Velarde and Rodriguez, and by attempting to conceal this fact he demonstrated consciousness of guilt. (See CALCRIM No. 317 ["If the defendant tried to hide evidence or discourage someone from testifying against [him], that conduct may show that [he] was aware of [his] guilt."].)

Substantial evidence also shows Belcher attempted to conceal his taking of Velarde's car by threatening her. Velarde testified that on May 15, before Belcher left her house in the jeep to get the car, he told her that he ruled the streets and that she better not do anything stupid, such as call the police, because he knew where she lived and that she had kids. Velarde's foregoing testimony is also substantial evidence from which a trier of fact could reasonably find that Belcher demonstrated consciousness of guilt by threatening her.

For all of the foregoing reasons, we reject Belcher's contention that his count 4 conviction of kidnapping Rodriguez to facilitate a carjacking must be reversed on the ground Rodriguez's testimony established his claim-of-right defense as a matter of law.

II. *SUFFICIENCY OF THE EVIDENCE (COUNT 4: ASPORTATION ELEMENT)*

Belcher also contends his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the evidence is insufficient to establish that he moved Rodriguez "a substantial distance from the vicinity of the carjacking" as required by section 209.5, subdivision (b) (hereafter section 209.5(b)). We reject this contention.

17

Section 209.5(a), which defines the offense of kidnapping to facilitate a carjacking, provides that "[a]ny person, who, during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person who is not a principal in the commission of the carjacking shall be punished by imprisonment in the state prison for life with the possibility of parole." "For section 209.5(a) to apply, the victim must be moved 'beyond [what is] merely incidental to the commission of the carjacking' and '*a substantial distance from the vicinity of the carjacking*,' and 'the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself.'" (*Medina, supra,* 41 Cal.4th at p. 693, italics added, quoting § 209.5(b).[4]) Thus, the asportation element of a violation of section 209.5 requires proof that the victim was moved "a substantial distance from the vicinity of the carjacking." (§ 209.5(b); *Medina*, at p. 693.)

In *People v. Moore* (1999) 75 Cal.App.4th 37 (*Moore*), the court explained that the term "vicinity," as it used in the phrase "a substantial distance from the vicinity of the carjacking" in section 209.5(b), means "'the quality or state of being near, proximity, a surrounding area or district; neighborhood.'" (*Moore,* at p. 45, quoting *People v. Ervin* (1997) 53 Cal.App.4th 1323, 1329.) The *Moore* court further explained that the phrase "a substantial distance from the vicinity of the carjacking" in section 209.5(b) does not

---

4    Section 209.5(b) provides: "This section shall only apply if the movement of the victim is beyond that merely incidental to the commission of the carjacking, the victim is moved *a substantial distance from the vicinity of the carjacking*, and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself." (Italics added.)

require the trier of fact to determine the outside boundary of the vicinity of the carjacking and then calculate whether the victim had been moved a substantial distance from that point. (*Moore*, p. 46.) Instead, any point within the vicinity of the carjacking may be used as a starting point for the calculation of whether the victim was moved a substantial distance. (*Ibid.*; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 315, p. 1152.)

In *Moore*, the victim put her two children inside her car, which was parked inside the garage attached to her house. (*Moore*, *supra*, 75 Cal.App.4th at p. 40.) She started the engine and then went back inside the house, leaving the children in the car. (*Ibid.*) The defendant walked into the open garage and drove the car away with the children still inside the car. (*Id.* at pp. 40-41.) One of the children jumped out of the car. (*Id.* at p. 41.) The defendant drove the car and the second child more than four miles from the victim's house, parked and abandoned the car, and then left the scene with the child inside the car. (*Ibid.*) Affirming the defendant's conviction of kidnapping during the commission of a carjacking and rejecting his claim that the phrase "the vicinity of the carjacking" in section 209.5(b) is unconstitutionally vague (*Moore*, at p. 43), the *Moore* court explained that "'[t]he "vicinity" of the carjacking logically and reasonably included [the victim's] garage where all the elements of the carjacking were completed.'" (*Id.* at p. 46.)

Here, Belcher's claim that there is insufficient evidence to show Rodriguez was moved "a substantial distance from the vicinity of the carjacking" within the meaning of section 209.5(b) is unavailing. Belcher asserts, and we accept, that the starting point for

19

the "vicinity of the carjacking" was Valdez's home, where Belcher took possession of the car after he drove Rodriguez there from Belcher's house in Rodriguez's jeep. Rodriguez testified that, at Valdez's house, Belcher directed him to get into the jeep, which was being driven by Belcher's armed associate. Belcher drove the car to a gas station, and the jeep followed. At the gas station Belcher instructed Campana to steal a Lexus, and Campana got into the Lexus and drove it away. With Rodriguez still inside the jeep, Belcher's armed associate drove the jeep away in a fast "crazy" fashion that alarmed Rodriguez and returned to Valdez's house. Belcher's armed associate eventually drove Rodriguez to Belcher's house where, only upon Belcher's approval, Belcher's armed associate returned the jeep to Rodriguez.

From the foregoing substantial evidence, we conclude any reasonable trier of fact could find the prosecution met its burden of establishing beyond a reasonable doubt the asportation element of Belcher's count 4 offense.

III. *SUFFICIENCY OF THE EVIDENCE* (*COUNT 4*: *FORCE OR FEAR*)

Belcher next contends his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the evidence is insufficient to establish that he moved Rodriguez by force or fear and without his consent on May 15. Again contravening the principles governing application of the applicable substantial evidence standard of review (discussed, *ante*) by viewing the conflicting evidence in the light most favorable to himself, Belcher contends that "undisputed evidence" shows that Rodriguez "voluntarily went with [Belcher]" on May 15, and that "the cause of danger to Rodriguez

20

was not from [Belcher], but from [Rodriguez's] wife, Velarde."  These unsupported contentions are unavailing.

Belcher, who was an active participant in the La Sierra gang, came to Velarde and Rodriguez's house on May 15 accompanied by a group of men, one of whom was armed with a gun.  Both Rodriguez and Velarde believed they had no choice but to give Belcher the car, which was parked at Valdez's house.  Velarde testified she was afraid and told Rodriguez to give Belcher the car because she did not want problems.  When the prosecutor asked her what she had been afraid of, Velarde replied, "Of whatever, you know, they would do to us there."  Rodriguez testified he believed he did not have another option and had to let Belcher take the car.  When the prosecutor asked why he felt he had no other option, Rodriguez replied, "[T]hese people were coming to take the car.  They were going to leave with the car one way or another."  When the prosecutor asked him whether he had felt any fear, Rodriguez responded he had felt "[a] little bit [of fear]."

Rodriguez's testimony also shows he could not believe what was happening to him as Belcher was driving him in the jeep to pick up the car.  Rodriguez testified that, at this point, he could not believe what was happening.  Specifically, he stated:  "I was almost, like, living something that I actually didn't think was happening . . . because this had never happened to me, you know.  Someone just for no reason is just going to come and take your things?"

Belcher first drove Rodriguez to Belcher's house. Rodriguez's testimony shows he became more afraid when they arrived there.  Rodriguez testified that practically

21

everyone who had been at his house was now at Belcher's house. Belcher's armed associate stood outside the jeep in which Rodriguez was sitting, stared at Rodriguez in an intimidating way, and then got into the back seat with him. As Belcher drove them in the jeep to pick up the car, Belcher's armed associate continued to stare menacingly at Rodriguez. Indicating he was afraid at that point, Rodriguez testified he "worked up the courage" and asked the armed man why he was staring at him, and the man responded, "Shut the fuck up, motherfucker. You think I can't kill you[?]"

From the foregoing substantial evidence, we conclude a reasonable trier of fact could find the prosecution met its burden of establishing beyond a reasonable doubt that Belcher moved Rodriguez by force or fear and without his consent on May 15.

IV. *INSTRUCTIONAL ERROR* (*COUNT 4*: *DEFENSE OF ACTUAL CONSENT*)

Belcher claims his count 4 conviction of kidnapping to facilitate a carjacking must be reversed because the court prejudicially erred by failing to instruct the jury on the defense of actual consent. This contention is unavailing.

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Belcher asserts that "it is undisputed that [he] was relying upon a defense of actual consent," that "the record shows [his] defense was squarely centered on the claim of consensual movements by Rodriguez," and that Rodriguez's movements were not the result of force or fear. He complains that the court failed to give the following language

22

that appears in brackets in CALCRIM No. 1204, the standard instruction on kidnapping during carjacking:

> "The defendant is not guilty of kidnapping if the other person consented to go with the defendant. The other person consented if (he/she) ( 1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime."

However, the record shows the court did instruct the jury that the prosecution was required to prove Rodriguez's lack of consent. Specifically, the court gave a modified version of CALCRIM No. 1204 which, although it did not include the foregoing language, did inform the jury that one of the elements of the offense charged in count 4 was that "[t]he other person did not consent to the movement."[5]

The court's instructions under CALCRIM No. 1204 also included optional bracketed language in that standard instruction that essentially defines the term "consent" by informing the jury that, "[i]n order to consent, a person must act freely and voluntarily and know the nature of the act."[6]

---

[5] CALCRIM No. 1204, as given by the court, stated in part: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] . . . [¶] 6. The other person did not consent to the movement."

[6] CALCRIM No. 1204 states in part: "[In order to *consent*, a person must act freely and voluntarily and know the nature of the act.]" (Original italics.)

In addition, the modified version of CALCRIM No. 1204 given by the court also included the bracketed language in the standard instruction concerning the "reasonable belief in consent" defense, which informed the jury that the prosecutor was required to prove that Belcher "did not actually and reasonably believe that [Rodriguez] consented to the movement."[7]

By giving these instructions, the court adequately and correctly told the jury that, in order to find Belcher guilty of kidnapping for purposes of carjacking, the People had to prove that Rodriguez did not actually consent, and that Belcher did not actually and reasonably believe that Rodriguez consented. We conclude Belcher has failed to meet his burden of showing the court committed prejudicial instructional error.

## V. *COUNT 3*

Belcher also contends that, if this court agrees there is insufficient evidence to support his count 4 conviction of kidnapping to facilitate a carjacking, his count 3 conviction of attempting to dissuade witness Velarde also must be reversed because "no crime remains which Velarde could have been dissuaded from reporting." This contention is unavailing because, for reasons already discussed, we have concluded substantial evidence supports Belcher's conviction of count 4.

---

[7]      CALCRIM No. 1204 states in part:  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶] . . . [¶] [ . . . 7.  The defendant did not actually and reasonably believe that the other person consented to the movement.]"

## VI. *INSTRUCTIONAL ERROR* (*COUNT 4: UNANIMITY*)

Belcher next contends his count 4 conviction of kidnapping Rodriguez to facilitate a carjacking must be reversed because the court erroneously failed to give the jury a unanimity instruction as to which movements constituted the kidnapping of Rodriguez. We reject this contention.

### A. *Applicable Legal Principles*

The requirement of jury unanimity in criminal cases is of constitutional origin. (*People v. Jones* (1990) 51 Cal.3d 294, 321, citing Cal. Const., art. I, § 16.) As this court explained in *People v. Muniz* (1989) 213 Cal.App.3d 1508, 1517, "[i]t is well established that the entire jury must agree upon the commission of the same act in order to convict a defendant of the charged offense."

"When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) "The duty to instruct on unanimity when no election has been made rests upon the court sua sponte." (*Ibid.*)

However, under the "continuous conduct" rule, a unanimity instruction is not required when "the acts alleged are so closely connected as to form part of one transaction" or "the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v.*

25

*Stankewitz* (1990) 51 Cal.3d 72, 100 (*Stankewitz*); *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275.) "Neither an election nor a unanimity instruction is required when the crime falls within the 'continuous conduct' exception." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882.)

"[P]roof of a course of conduct offense will usually consist of evidence of various incidents occurring over a period of time." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1451). A "continuous course of conduct, by its nature, may stop and start." (*People v. Rae* (2002) 102 Cal.App.4th 116, 124 (*Rae*).)

B. *Analysis*

In support of his contention that the court erroneously failed to give the jury a unanimity instruction, Belcher asserts "there were five movements of Rodriguez in evidence": (1) "[t]he movement of Rodriguez from the park into his home"; (2) "[t]he trip from Rodriguez's home to [Belcher's] home"; (3) "[t]he trip from [Belcher's] home to Valdez's home, to pick up the car"; (4) "Rodriguez['s] accompanying the men to the gas station, after picking up the [car]"; and (5) "[t]he trip back to Valdez's house after Campana took the Lexus." Belcher also asserts "there was no continuous course of conduct that constituted a kidnap[ping] of Rodriguez" because "[e]ach of these movements was separate and distinct and the jury may have believed each could have formed the basis for the asportation element" of the charged count 4 offense of kidnapping Rodriguez to facilitate a carjacking.

We reject Belcher's contention that the court erred by failing to instruct the jury on unanimity because the record shows he "offer[ed] essentially the same defense to each of

26

the acts, and there is no reasonable basis for the jury to distinguish between them" (*Stankewitz*, *supra*, 51 Cal.3d at p. 100). During closing arguments, defense counsel essentially treated Belcher's interactions with Rodriguez as one course of conduct and presented the defense that Rodriguez freely and voluntarily associated with Belcher and his associates on May 15. For example, in challenging the prosecution's accusation that Belcher kidnapped Rodriguez, counsel argued that it "[d]oesn't fit" because the evidence showed Rodriguez was "hanging out" with Belcher that day. Counsel also argued, "[L]ook at the actions. While supposedly being kidnapped, [Rodriguez] asks his captors to borrow 20 bucks, smokes meth with him, and then at the end of the night, says, you know, I'm kind of tired. Take me home. And if you want to borrow the Jeep, you can bring it back tomorrow."

Neither the defense nor the prosecution distinguished between the various movements of Rodriguez on May 15, and there was no reasonable basis for the jury to distinguish between them in light of the substantial evidence (discussed, *ante*) showing that Belcher and his armed associate maintained control over Rodriguez during all of those movements. The fact that the proof of the asportation element of count 4 consisted of evidence that Rodriguez was moved multiple times on May 15 under Belcher's direction and control is no bar to the application of the "continuous conduct" rule because a "continuous course of conduct, by its nature, may stop and start" (*Rae*, *supra*, 102 Cal.App.4th at p. 124), as it did here.

27

## VII. *IMPROPER ELEVATION OF BELCHER'S COUNT 5 CONVICTION FROM A MISDEMEANOR TO A FELONY*

Belcher argues his count 5 felony conviction of carrying a concealed weapon in a motor vehicle (§ 25400, subd. (c)(3)) must be reversed because it was "improperly elevated to a felony." The People concede that Belcher's count 5 conviction must be reduced to a misdemeanor. We agree.

As the parties correctly point out, where presumptively misdemeanor conduct is made a felony by virtue of a person's status as an active participant in criminal street gang, the elements of active participation in a criminal street gang—including the "willful[] promot[ion ], further[ance], or assist[ance] in any *felonious* criminal conduct by members of that gang" (§ 186.22(a), italics added)—must be proven independently *before* the misdemeanor conduct can be elevated to a felony. (*People v. Lamas* (2007) 42 Cal.4th 516, 524-525; *People v. Robles* (2000) 23 Cal.4th 1106, 1115; compare § 25400, subd. (c)(3) with § 25400, subd. (c)(7).)

Here, as the parties also point out, the presumptively misdemeanor conduct of carrying a concealed firearm was charged as a felony in count 5 because the prosecution alleged that Belcher was an active participant in a criminal street gang on May 18. However, the count charging Belcher with active participation in a criminal street gang was based not on independent felony conduct by members of the La Sierra gang, but on Belcher's carrying the concealed firearm. As there was no evidence that, on May 19, Belcher promoted, furthered, or assisted felonious conduct by other gang members

28

distinct from his own presumptively misdemeanor offense of carrying a concealed firearm, that misdemeanor conduct was improperly elevated to a felony.

Accordingly, Belcher's count 5 conviction must be reversed and, as requested by the Attorney General, the matter remanded to the superior court with directions to reduce that conviction to a misdemeanor.

VIII. *SUFFICIENCY OF THE EVIDENCE TO ESTABLISH BELCHER ENGAGED IN FELONIOUS CONDUCT (COUNT 1: ACTIVE PARTICIPATION IN A CRIMINAL STREET GANGFORCE OR FEAR)*

Belcher also argues his conviction of active participation in a criminal street gang (count 1: § 186.22(a)) must be reversed because the evidence is insufficient to establish that he engaged in any felonious criminal conduct on May 19 as charged in that count.

The People acknowledge that Belcher's conviction must be reversed, asserting that "the active gang participation conviction relied on [Belcher's] 'promot[ion ], further[ance], or assist[ance]' of the unlawful carrying of a concealed weapon [citation] which was *misdemeanor* conduct and thus fell short" of the "felonious criminal conduct" required by section 186.22(a).

We agree with the parties that Belcher's conviction of this count is unsupported by substantial evidence. During closing arguments the prosecutor argued that "the felony conduct that the People have alleged for May 19th is that he drove in a vehicle with a concealed weapon." We have already concluded, however, that there was no evidence that on May 19 Belcher promoted, furthered, or assisted felonious conduct by other gang members distinct from his own presumptively misdemeanor offense of carrying a concealed firearm. Accordingly, Belcher's conviction of active participation in a criminal

29

street gang must be reversed and the matter remanded to the superior court with directions to dismiss that count.

IX. *SENTENCING ERROR* (*COUNT 3*: *ATTEMPTING TO DISSUADE A WITNESS*)

Next, citing *People v. Lopez* (2012) 208 Cal.App.4th 1049 (*Lopez*), Belcher argues the court erred by imposing an indeterminate term of seven years to life pursuant to section 186.22, subdivision (b)(4)(C) for his count 3 conviction of attempting to dissuade Velarde from reporting a suspected crime. As the Attorney General concedes, Belcher's argument is meritorious.

Belcher was charged in count 3 with "attempt[ing] to prevent and dissuade [Velarde], a victim and a person who was and who might become a witness from reporting a suspected crime" in violation of section 136.1, subdivision (b)(1). Count 3 also alleged that Belcher "committed the offense . . . for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in any criminal conduct by gang members, within the meaning of [section 186.22(b)]."

The jury found Belcher guilty of count 3. The jury also found he committed the offense for the benefit of a criminal street gang within the meaning of section 186.22(b).

For certain enumerated crimes, the gang statute calls for an indeterminate enhancement. (§ 186.22, subd. (b)(4)(A)-(C).) Among the enumerated crimes is making "threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(C).) The gang enhancement for this offense is an indeterminate term of seven years to life. (*Ibid*.)

30

In *Lopez*, *supra*, 208 Cal.App.4th at page 1065, the court held the indeterminate gang enhancement of section 186.22, subdivision (b)(4)(C) may be imposed for victim or witness intimidation *only* if the defendant was convicted of section 136.1, *subdivision (c)(1)*, because that subdivision is the only provision in section 136.1 that refers to use of an implied or express threat.[8]

*Lopez*, *supra*, 208 Cal.App.4th 1049, is controlling.  Gutierrez was convicted of of a violation of subdivision section (b)(1), not of a violation of subdivision (c)(1), of section 136.1.  In addition, the jury did not make any factual finding that Belcher used threats; thus, under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, and its progeny, imposition of an indeterminate enhancement under section 186.22, subdivision (b)(4)(C) violates constitutional precepts.

Accordingly, Belcher's seven-year-to-life sentence for his count 3 conviction of intimidating a witness must be reversed and the case remanded for resentencing.

X. *SUFFICIENCY OF THE EVIDENCE TO ESTABLISH THE PRIMARY ACTIVITIES AND PATTERN OF CRIMINAL ACTIVITY ELEMENTS (COUNT 1 & GANG ENHANCEMENTS)*

Belcher also contends his conviction of active participation in a criminal street gang (count 1) and the gang enhancements imposed as to counts 3, 4, and 6 (hereafter

---

[8]    Subdivision (c)(1) of section 136.1 provided:  "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:  (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person."

collectively referred to as the gang charges) must be reversed because the prosecution's evidence—specifically, the testimony of the People's gang expert, Detective Adrian Tillett—is insufficient to prove the primary activities and pattern of criminal activity"elements of the gang charges.  We reject this contention.

A.  *Detective Tillett's Expert Testimony*

Detective Tillett testified he was currently assigned to the Gang Intelligence Unit of the Riverside Police Department, and had worked there for more than two years.  He had 13 years of experience in the Riverside Police Department, where he started as a patrol officer.  He patrolled all areas of the City of Riverside, including the La Sierra portion of the city.  He was familiar with the La Sierra gang as a result of formal training, personal interactions with its members, speaking with other officers and agencies in the area, reviewing police reports, and seeing graffiti attributed to that gang  The La Sierra Brown Knights was one of four "cliques" in the La Sierra Riva gang.  Detective Tillett opined that Belcher was an active participant in the La Sierra Brown Knights in May.  Campana was also an active participant of the gang at that time.

Detective Tillett also testified that, as a gang expert, he was required to understand the law on gangs and the legal definition of a criminal street gang.  He defined "primary activities" of a gang as "the crimes . . . that [the] gang . . . is routinely and consistently committing."  He opined that the La Sierra gang's primary activities were "weapon possessions and violent assaults."  He added that its member had also been convicted of "grand theft auto, or stolen vehicles, robbery, and illegal drug sales."

32

When the prosecutor asked Detective Tillett to explain the term "weapons possession," he replied it meant "unlawful possession, felon in possession," "concealed" possession under (former) section 12025, and "loaded possession" under (former) section 12031.

Detective Tillett testified about three La Sierra gang "predicate offenses."[9] Specifically, he testified about (1) La Sierra gang member Paul Casilla's January 2011 offense of possessing a concealed and loaded firearm in his vehicle (*People v. Casilla* (Super. Ct. Riverside County, 2011, No. RIF1101291)); (2) La Sierra gang members Paul and Marcos Casilla's August 2011 offenses of being a felon in possession of a firearm (*People v. Casilla et al.* (Super. Ct. Riverside County, 2011, No. RIF1104652)); and (3) La Sierra gang member Danny Flores's April 2012 offense of possessing a concealed and loaded semiautomatic firearm in his vehicle (*People v. Flores* (Super. Ct. Riverside County, 2012, No. RIF1202345)). Certified copies of the conviction records were not entered into evidence.

B. *Statutory Scheme* (*STEP Act*)

The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq., hereafter the STEP Act) provides for a substantive offense under section 186.22(a), as well as for enhanced punishment under section 186.22, subdivision (b)(1) (hereafter

---

[9] The prosecution was required to present this predicate offenses" evidence to show the La Sierra gang engaged in a "pattern of criminal gang activity" within the meaning of section 186.22, subdivision (e), discussed, *post*). (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047 (*Hernandez*).

section 186.22(b)(1)) for members of "criminal street gangs" under specified circumstances.

The STEP Act defines a "criminal street gang" as an organization having as "one of its *primary activities*" (italics added) the commission of certain enumerated offenses, with a common name or identifying symbol, whose members have individually or collectively engaged in a "pattern of criminal gang activity." (§ 186.22, subd. (f), hereafter section 186.22(f).)[10]

"The phrase 'primary activities,' as used in the [Step Act], implies that the commission of one or more of the statutorily enumerated [predicate offenses] is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)

The term "pattern of criminal gang activity" is defined in section 186.22, subdivision (e) (hereafter section 186.22(e)) to mean "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" predicate offenses enumerated in that subdivision.

The substantive offense defined in section 186.22(a), active participation in a criminal street gang, has three elements: (1) participation in a criminal street gang that is

_____

10    Section 186.22(f) provides: "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.)

more than nominal or passive; (2) knowledge that the gang's members engage in, or have engaged in, a pattern of criminal gang activity; and (3) willful promotion of, furtherance of, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas*, *supra*, 42 Cal.4th at p. 523.) In *People v. Rodriguez* (2012) 55 Cal.4th 1125, our high state court explained that, "to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, at p. 1132.)

As noted, the STEP Act also prescribes increased punishment for a felony if it was related to a criminal street gang. (*Hernandez*, *supra*, 33 Cal.4th at p. 1047, citing § 186.22(b)(1).) To subject a defendant to the gang enhancement under section 186.22(b)(1), the prosecution must prove beyond a reasonable doubt that the crimes for which he was convicted were committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1); see *Hernandez*, *supra*, 33 Cal.4th at p. 1047.)

The prosecution may meet its burden of establishing the statutory gang enhancement elements set forth in section 186.22 by presenting expert testimony about criminal street gangs. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-620; *Hernandez*, *supra*, 33 Cal.4th at pp. 1047-1048.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have

35

committed criminal activity listed in the gang statute" (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324, italics omitted) and may be presented through expert testimony. (*Ibid.*) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465, citing *Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1005 [the primary activities element is a proper subject of expert opinion].)

### 1. *Standard of review*

As discussed, *ante*, we apply the substantial evidence standard of review to assess the sufficiency of the evidence and under that standard we view the entire record in the light most favorable to the judgment and determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which any rational trier of fact could have found the essential elements of the charged crime or allegation proven beyond a reasonable doubt. (*Jackson v. Virginia*, *supra*, 443 U.S. at p. 319; *People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)

### C. *Analysis*

### 1. *Primary activities*

We reject Belcher's contention that his conviction of active participation in a criminal street gang and the gang enhancements must be reversed because the testimony

36

of the People's gang expert, Detective Tillett, is insufficient to prove the primary activities element of the gang charges.

As already discussed, our high court has explained that the phrase "primary activities" as used in the Step Act "implies that the commission of one or more of the statutorily enumerated [predicate offenses] is one of the group's 'chief' or 'principal' occupations." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.)

Here, Detective Tillett's expert gang testimony supports the jury's implied finding that one of the La Sierra gang's chief or principal occupations was the commission of one or more of the offenses enumerated in section 186.22(e). Detective Tillett testified he was assigned to the Riverside Police Department's Gang Intelligence Unit, and he had worked there for more than two years. He was familiar with the La Sierra gang as a result of formal training, personal interactions with its members, speaking with other officers and agencies in the area, reviewing police reports, and seeing graffiti attributed to that gang He testified to his knowledge of the law on gangs and the legal definition of a criminal street gang, and he explained that the primary activities of a gang are "the crimes . . . that [the] gang . . . is routinely and consistently committing."

Detective Tillett testified that the La Sierra gang's primary activities were "weapon possessions and violent assaults." When asked to explain the term "weapons possession," Detective Tillett elaborated by specifying "unlawful possession, felon in possession"; "concealed" possession; and "loaded possession."

All of the offenses Detective Tillett specified are enumerated in section 186.22(e). His term "unlawful possession, felon in possession" is a reference to the crime of being a

37

felon in possession of a firearm. That crime is enumerated in section 186.22, subdivision(e)(31), which lists: "Prohibited possession of a firearm in violation of Section 12021 until January 1, 2012, and on or after that date, Chapter 2 (commencing with Section 29800) of Division 9 of Title 4 of Part 6."[11]

Detective Tillett's reference to "concealed" possession is a reference to the crime of unlawfully carrying a concealed firearm. That crime is enumerated in section 186.22, subdivision (e)(32), which specifies: "Carrying a concealed firearm in violation of Section 12025 until January 1, 2012, and, on or after that date, Section 25400."

Last, Detective Tillett's reference to "loaded" possession is a reference to the crime of unlawfully carrying a loaded firearm. That crime is enumerated in section 186.22, subdivision (e)(33), which lists: "Carrying a loaded firearm in violation of Section 12031 until January 1, 2012, and, on or after that date, Section 25850.

A reasonable jury could find from Detective Tillett's testimony that "one of [the] primary activities" (§ 186.22(f)) of the La Sierra gang was "the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of [section 186.22(e)]" (§ 186.22(f)).

2. *Pattern of criminal gang activity*

We also reject Belcher's contention that his conviction of active participation in a criminal street gang and the gang enhancements must be reversed because Detective

---

[11]    Effective January 1, 2012, former section 12021, subdivision (a), was repealed and reenacted without substantive change as section 29800, subdivision (a). (*People v. White* (2014) 223 Cal.App.4th 512, 518, fn. 2.)

Tillett's expert testimony is insufficient to prove the pattern of criminal activity element of the gang charges.

As pertinent here, the term "pattern of criminal gang activity" is defined in section 186.22(e) to mean "the commission . . . or conviction of two or more" predicate offenses enumerated in that subdivision.

As discussed more fully, *ante*, Detective Tillett testified about three La Sierra gang predicate offenses. Belcher asserts that, "[i]n light of the failure of the prosecution to provide proper proof of the predicate offenses, this element of the gang charges was insufficient as a matter of law." Specifically, he complains that "the prosecution did not offer documents showing the commission of the three purported predicate crimes, such as abstracts of judgment, change of plea forms or certified copies of minute orders."

Assuming, without deciding, that Detective Tillett's expert testimony alone was insufficient, Belcher's contentions are unavailing because the charged offenses in the current case also can be considered in deciding whether a pattern of criminal gang activity as defined in section 186.22(e) exists. (*Gardeley*, *supra*, 14 Cal.4th at p. 625.)

As pertinent here, the jury convicted Belcher of (1) witness intimidation (count 3: § 136.1, subd. (b)(1)); (2) kidnapping for purposes of carjacking (count 4: § 209.5); (3) carrying a concealed weapon in a motor vehicle (count 5 (May 18): § 25400, subd. (c)(3)); and (4) vehicle theft (count 6: Veh. Code, § 10851, subd. (a)). All of these offenses are enumerated as predicate offenses in section 186.22(e). In addition, the May 15 offenses took place on a "separate occasion[]" from the May 18 offense. (See § 186.22, subd. (e); see also *People v. Loeun* (1997) 17 Cal.4th 1, 9-10 [§ 186.22 "allows

the prosecution the choice of proving the requisite 'pattern of criminal gang activity' by evidence of 'two or more' predicate offenses committed 'on separate occasions' *or* by evidence of such offenses committed 'by two or more persons' on the same occasion", original italics].)

For all of the foregoing reasons, we conclude the evidence is sufficient to support the jury's implied finding that the prosecution met its burden of proving the primary activities and pattern of criminal activity elements of the gang charges.

## XI. *INSTRUCTIONAL ERROR CLAIM* (*COUNT 1 & GANG ENHANCEMENTS*)

Belcher also contends, in the alternative, that his count 1 conviction of active participation in a criminal street gang on May 19 and the gang enhancements imposed as to the May 15 offenses charged in counts 3, 4, and 6 must be reversed because the court failed to sua sponte instruct the jury as to the specific enumerated offenses the prosecution was relying upon to prove the requisite primary activities and pattern of criminal activity elements of the gang charges. The People acknowledge the jury instructions were deficient, but assert the error was harmless beyond a reasonable doubt "because all the predicate offenses and primary activities presented to the jury were enumerated offenses." We agree the error was harmless.

The court instructed the jury that one or more of the "primary activities" of the alleged gang must be the commission of "felonies" and that the term "pattern of criminal

40

activity" meant the commission of two or more "felonies."[12] Instead of using the term "felonies," the court should have instructed the jury on the specific enumerated offenses upon which the prosecution was relying to prove that La Sierra was a criminal street gang. Specifically, regarding the primary activities element, the court should have "insert[ed] one or more crimes listed in [section] 186.22(e)(1)(25), (31)-(33)"; and, regarding the pattern of criminal activity element, it should have "insert[ed] felony or felonies from [section] 186.22(e)(1)–(25), (31)-(33)." (See CALCRIM No. 1400.) The court erred in failing to do so.

We conclude, however, that the court's error in omitting specified enumerated offenses from the jury instructions was harmless beyond a reasonable doubt because there is no reasonable likelihood it could have affected the jury's verdict. As discussed, *ante*, the prosecution introduced its evidence of primary activities and predicate offenses through the gang expert, Detective Tillett, who testified that the primary activities of the La Sierra gang were "violent assaults and weapons possessions." Detective Tillett clarified that the latter referred to possession by prohibited persons, and possession of

---

12    In its instruction on count 1 ("Active Participation in a Gang"), the court gave a modified version of CALCRIM No. 1400, the standard instruction on the substantive gang charge under section 186.22(a), which stated in part: "A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] . . . [¶] 2. That has, as one or more of its primary activities, the commission of *felonies*[.]" (Italics added.) The court's version of CALCRIM No. 1400 also instructed the jury that "[a] pattern of criminal gang activity, as used here, means: [¶] 1. The commission of two or more *felonies*[.]" (Italics added.) The court also gave a modified version of CALCRIM No. 1401, the standard section 186.22(b)(1) gang enhancement instruction, that "[a] criminal street gang is defined in the instructions for Count One to which you should refer."

41

concealed or loaded firearms.  We have already concluded that all of these are enumerated predicate offenses.  (See § 186.22, subds. (e)(31), (e)(32) & (e)(33).)

The only other felonies presented to the jury were the currently charged offenses. We have already concluded that, except for the gang charges themselves, every offense that the jury was presented, and of which the jury found Belcher guilty in this case, was an enumerated offense.  (See § 186.22, subds. (e)(8), (e)(15), (e)(21), (e)(25), (e)(32).) Thus, we conclude the court's instructional error was harmless beyond a reasonable doubt.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 627 [error in specifying "misdemeanor assault" as a predicate offense in gang instructions was harmless beyond a reasonable doubt because no evidence was introduced that any gang member had been arrested for, or convicted of, simple assault].)

## XII.  *CUMULATIVE ERROR CLAIM*

Last, Belcher contends that, if this court determines that none of the foregoing claimed errors "individually warrant reversal" of his convictions, reversal is required under the cumulative error doctrine because "the cumulative effect of all these errors demonstrates that a miscarriage of justice occurred."  We reject this contention.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]  When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams*, *supra*, 170 Cal.App.4th at p. 646.)  However, to prevail on a claim of cumulative error, the defendant must show the

42

"errors . . . undermine[d] the facts supporting [his] guilt" and "explain[] how or why these errors in combination warrant a new trial." (*People v. Hinton* (2006) 37 Cal.4th 839, 872.)

Here, as we have already concluded, Belcher has shown his conviction of count 1 should be reversed and his felony conviction of count 5 should be reduced to a misdemeanor. As to the remaining counts Belcher has made no attempt to show how any errors we have found, and any others we may have assumed, undermined the facts supporting his guilt, and he has not explained how or why these errors in combination warrant a new trial. Accordingly, we reject his cumulative-error claim. (See *People v. Hinton*, *supra*, 37 Cal.4th at p. 872.)

## DISPOSITION

The judgment is reversed in part and affirmed in part. Belcher's conviction of count 1, the sentence of seven years to life in prison imposed for his conviction of count 3, and his felony conviction of count 5 are all reversed. The matter is remanded to the superior court with directions to dismiss count 1, reduce Belcher's count 5 conviction from a felony to a misdemeanor, and conduct a new sentencing hearing. In all other respect, the judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.

43